IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JASON MEYERS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. _____ |
| | § | |
| WESTERN GOVERNORS UNIVERSITY | § | |
| | § | |
| Defendant. | § | |
| | § | |

## PLAINTIFF'S SWORN ORIGINAL COMPLAINT

Jason Meyers ("Plaintiff" or "Meyers"), files his Sworn Original Complaint against Defendant Western Governors University ("WGU" "the Company" or "Defendant").

### I.  SUMMARY

1.      This is an employment case brought under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et. seq.* Meyers worked remotely for WGU from his home in Austin, Texas, for more than nine years.  In 2024, WGU announced that all managers at his level and above had to move to Utah by August 2025, to work from its office in Salt Lake City.  Meyers suffers from ADA-defined mental disabilities that preclude him from working in an office with other workers.  Accordingly, Meyers sought a reasonable accommodation from WGU to allow him to continue working remotely from his home, as he had successfully done for the prior nine-plus years.  Meyers backed up his request with documentation from his treating mental health professional: (a) confirming that he had an ADA-defined disability; and (b) stating that he could continue to perform his job's essential functions if he was permitted to continue working from home.  WGU summarily rejected Meyers's request and fired him on August 7, 2025.  As a result, Meyers brings this lawsuit against WGU for terminating his employment in violation of the ADA.

## II.  THE PARTIES AND JURISDICTION

2.      The Plaintiff, Meyers, is a natural person residing in Austin, Texas.  He was employed by WGU.  Meyers has standing to file this lawsuit.

3.      Defendant, WGU is a not-for-profit company, with its principal place of business and corporate headquarters located in Salt Lake City, Utah, that may be served with process through its registered agent for service, Cogency Global Inc. 1601 Elm St., Suite 4360, Dallas, TX 75201-3136.

4.      During 2023, 2024, and 2025 WGU, engaged in an industry affecting commerce and had 501 or more employees for each working day in each of 20 or more calendar weeks in all three calendar years.

5.      The Court has personal jurisdiction over WGU based on both general and specific jurisdiction.

6.      The Court has subject matter jurisdiction over this case based on federal question jurisdiction under the ADA.

## III.  FACTUAL BACKGROUND

7.      Meyers has a B.A. in Psychology from Emory University, a M.A. in Educational Psychology from the University of Texas at Austin, and a Ph.D. in Educational Psychology from the University of Texas at Austin with an area of specialization in Quantitative Methods (Psychometrics, Statistics, Research Methodology, and Program Evaluation).   At relevant times he was also a member of the National Council on Measurement in Education, the American Educational Research Association, the Psychometric Society, and the Association of Test Publishers.

8.      For 20+ years Meyers has suffered from clinically diagnosed depression, anxiety, and panic disorders for which he has been professionally treated and has taken prescription

medication including Paroxetine (Paxil), Velnafaxine (Effexor), Fluoxetine (Prozac), Gabapentin (Neurontin), Mitrazapine (Remeron), Clonazepam (Klonopin), Escitalopram (Lexapro), Diazepam (Valium), Aripiprazole (Abilify), Vortioxetine (Brintellix), Alprazolam (Xanax), Vilazodone (Viibryd), Duloxetine (Cymbalta), Ziprasidone (Geodon), Divalproex (Depakote), Larasidone (Latuda), Propanolol (Inderol), Benztropine (Cogentin), Lithium Carbonate (Lithium), Meclizine, and Busprione (Buspar). These disabilities, and most especially Meyers's anxiety, substantial impair his ability to work in an office environment physically around coworkers.

9.      WGU is a private online university. The university uses an online competency-based learning model, providing advanced education for working professionals. WGU was founded by 19 U.S. governors in 1997, after the idea was formulated at a 1995 meeting of the Western Governors Association to expand education offerings to the internet.

10.      In May 2016 Meyers was hired by WGU in the role of Senior Psychometrician. Meyers sought out this position and only accepted it because WGU allowed it to be a "work from home" role, which, as noted above, was what he needed to accommodate his disabilities, and most specifically his anxiety. Meyers made it very clear at the time of his hire that he needed to work remotely. Meyers performed well in the role and in 2019 was promoted to the position of Senior Manager of Psychometrics. Meyers performed well that in role, and in 2023 he was promoted to the position of Director of Psychometrics.

11.      On August 2, 2024, Meyers received a phone call from David Perkinson, Senior Vice President – Program Development. Perkinson informed Meyers that WGU had decided to require employees at his level and above to move to WGU's headquarters in Salt Lake City, Utah to physically work from its office there by August 1, 2025. Because of the workplace limitations

caused by his disabilities, that was not possible for Meyers. Rather, Meyers needed to continue to work from home.

12.    Accordingly, on August 6, 2024, Meyers formally requested a work from home accommodation under the ADA. In response, Meyers received a form from WGU for his treating medical professional to fill out concerning his reasonable accommodation request. The next day, August 7, 2024, Meyers saw his treating mental health professional, Wendy Lowry, MSN, APRN, PMHNP-BC. Lowry is a board certified psychiatric mental health nurse practitioner. *See* https://www.northwestpsychiatry.com/wendy-w--lowry--msn--aprn--pmhnp-bc/. Lowry filled out the form. *See* Ex. A. She indicated on the form that:

    a.  Meyers had ADA-defined disabilities. *See* Ex. A.

    b.  His ADA-defined disabilities substantially impaired his ability to work in the office. *See* Ex. A.

    c.  He could be reasonably accommodated by allowing him to work from home permanently. *See* Ex. A.

13.    On August 8, 2024, Lowry sent the form to WGU and WGU confirmed that it received the form and stated that it was "now in the review process." After that, more than two and one-half months went by with no response to Meyers's ADA reasonable accommodation request.

14.    Finally, on October 30, 2024, Meyers had a virtual meeting with Ashley Gonzalez, Senior Benefits Analyst P&T Leave & Disability Specialist and Randi Billingsley-White, People and Talent Business Partner. They flatly told Meyers that his request for accommodation was rejected. That day, and the next day, Meyers asked them to send him "documentation on this decision and rationale." *See* Ex. B at page 4 of 5. Over the next approximately two weeks Meyers did not receive any such documentation, so he asked them again for it on November 13, 2024. *See*

Ex. B at page 2 of 5. Another two weeks went by with no explanation for the decision and rationale for denying Meyers's ADA request for an accommodation.

15.    In the meantime, under financial and emotional duress, fearing he could be fired, and believing that his accommodation request should and could be reconsidered and granted – and thus moot out the issue – on November 1, 2024, Meyers complied with WGU's demand to represent that he would move to Utah by August 2025 and work in the Salt Lake City office. However, as Meyers and his treating mental health professional had already previously told WGU, that was impossible, because of the workplace limitations caused by his disabilities.

16.    Finally, on December 2, 2024, Ashley Gonzalez sent Meyers an email stating that his request for an ADA accommodation had been and remained denied because of "WGU's evolving business needs and Future of Work initiative, it has been determined that effectively performing the essential functions of your role as Director, Psychometrics requires co-location in WGU's Salt Lake City office. Therefore, we are unable to grant this accommodation." *See* Ex. B at page 1 of 5. WGU did not offer any other suggestions for how Meyers could be accommodated. Nor did it ever engage in any interactive dialogue with Meyers to discuss or brainstorm about possible reasonable accommodations. Rather, it simply flatly denied his ADA reasonable accommodation request based on the vague grounds reflected in Ashley Gonzalez's belated email. *See* Ex. B at page 1 of 5.

17.    WGU's position made no sense. Nothing about Meyers's job was going to change – it would be the same job he had been doing since he assumed the role. No additional job duties or new or different written job description were provided to Meyers. During Meyers's entire time in the role (indeed, his entire time at WGU since 2016 in all three of his roles) he had satisfactorily performed all his job's essential functions, as reflected by WGU's own reviews of his performance.

Neither Ashley Gonzalez nor anyone else at WGU ever explained to Meyers how it makes any sense to claim that working physically from its office in Salt Lake City is suddenly an essential function of his job when he had been satisfactorily performing the job from his home the entire time that he had the job.

18.     On April 30, 2025, Meyers filed a timely charge of discrimination with the EEOC that encompassed the factual and legal allegations set forth in this lawsuit.  On May 29, 2025, Meyers obtained a Right to Sue Letter from the EEOC, giving him ninety days from its receipt to file a timely ADA lawsuit against WGU.

19.     On August 7, 2025, WGU terminated Meyers for not relocating to Utah to work in person at its Salt Lake City office.  Meyers's annual salary at the time of his termination was $183,700 and he had been eligible for an annual bonus.  In 2024, the bonus was $10,000.  Meyers is now unemployed and looking for a new job.

## IV.  ADA DISCRIMINATORY TERMINATION CLAIM BASED ON A FAILURE TO ACCOMMODATE

20.     "The ADA prohibits an employer from discriminating against a 'qualified individual with a disability on the basis of that disability.'" *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (quoting 42 U.S.C. § 12112(a)).  "When a plaintiff can offer only circumstantial evidence to prove a violation of the ADA, [a] court applies the *McDonnell Douglas* burden-shifting framework." *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009).   Under this framework, the plaintiff must make a *prima facie* showing of discrimination. *Id.*  "To establish a *prima facie* discrimination claim under the ADA, a plaintiff must prove: (1) that he has a disability; (2) that he was qualified for the job; [and] (3) that he was subject to an adverse employment decision on account of his disability." *LHC Grp., Inc.*, 773 F.3d at 697.

21.     Once the *prima facie* showing is made, a presumption of discrimination arises, and the employer must "articulate a legitimate non-discriminatory reason for the adverse employment action." *Chevron Phillips Chem. Co., LP*, 570 F.3d at 615.  The burden then shifts to the plaintiff to show the articulated reason is pretextual. *Id.*

22.     In this case, Meyers can make out a *prima facie* case.  WGU cannot articulate a legitimate non-discriminatory reason for his termination.  Rather, WGU's articulated reason for his termination is itself an admission of an ADA violation.  *See infra.*  In fact, as explained below, Meyers prevails under either a circumstantial evidence analysis, or a direct evidence analysis.

A.     **First Element of His *Prima Facie* Case:  At All Relevant Times Meyers Had Actual Disabilities Under The ADA**

23.     Under 42 U.S.C. §12102(1), the term "disability" is defined, in relevant part, as, "a physical or mental impairment that substantially limits one or more major life activities of [an] individual."  Under 42 U.S.C. §12102(2) major life activities include:

> (A)    In general
>
> For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.
>
> (B)    Major Bodily Functions
>
> For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

24.     In 2009, statutory revisions to the ADA broadened the definition of disabled. ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat. 3553 (ADAAA) ("The definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act.").

25.     "The ADAAA is principally aimed at reversing Supreme Court precedent perceived as improperly narrowing the scope of protection originally intended by drafters of the ADA." Louis P. DiLorenzo, The Intersection of the FMLA and ADA–As Modified by NDAA, ADAAA and GINA, 860 PLI/Lit 47, 83–84 (June 23, 2011); 29 C.F.R. § 1630.1(c)(4) ("reinstating a broad scope of protection under the ADA"; "the definition of 'disability shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA"). The EEOC emphasized that "the primary object of attention in cases . . . should be whether the covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability." 29 C.F.R. § 1630.1(c)(4).

26.     The ADAAA further states that the intent of these changes is that employers stop engaging in "extensive analysis" to determine what constitutes a disability under the law, and focus instead on complying with their obligation not to discriminate and to provide reasonable accommodations to individuals who are otherwise qualified to do a job. It also provides the following "[r]ules of construction" regarding the definition of disability:

> The definition of "disability" in paragraph (1) shall be construed in accordance with the following:
>
> (A)     The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.
>
> (B)     The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.
>
> (C)     An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.
>
> (D)     An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.
>
> (E)(i)  The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as—

-8-

> (I)    medication, medical supplies, equipment, or appliances, low-vision
> devices (which do not include ordinary eyeglasses or contact lenses), prosthetics
> including limbs and devices, hearing aids and cochlear implants or other
> implantable hearing devices, mobility devices, or oxygen therapy equipment and
> supplies . . . .

42 U.S.C. §12102(4).

27.    Here, under the ADAAA, at all relevant times in this case Meyers had "a physical

or mental impairment that substantially limits one or more major life activities of [an] individual,"

in that his depression, anxiety, and panic disorders substantially limited him in the major life

activities of interacting with others, learning, reading, performing manual tasks, speaking,

thinking, and walking. *See* Ex. A; 42 U.S.C. § 12102(2)(A).  This was validated in writing by

Meyers's treating mental health professional, Lowry. *See* Ex. A.  Accordingly, there is no question

that Meyers's depression, anxiety, and panic disorders qualify as actual disability under the ADA.

*See, e.g., Way v. City of Missouri City*, 133 F.4th 509, 520 (5th Cir. 2025) ("In short, the record

includes enough evidence for a jury to find that Way's anxiety qualifies as a disability under the

ADA . . ."); *De Hoyos v. Northeast Ill. Reg. Commuter R.R. Corp.*, 688 F. Supp.3d 708, 720-21

(N.D. Ill. 2023) (finding that a reasonable jury could conclude that former employee's depression

rendered him "disabled" within the meaning of ADA, precluding summary judgment on his claim

that his employer violated the ADA by failing to accommodate his depression).

**B.    Second Element of His *Prima Facie* Case:  Meyers Was A Qualified Individual With A Disability**

28.    The ADA's definition of a "qualified individual" is "an individual who, with or

without reasonable accommodation, can perform the essential functions of the employment

position . . . ."  42 U.S.C. § 12111(8).

29.    Under the ADA:

The term "reasonable accommodation" may include—

    (A)    making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

    (B)    job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

    30.    "A failure-to-accommodate claim requires a showing that: '(1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations.'" *Weber v. BNSF Ry. Co.*, 989 F.3d 320, 323 (5th Cir. 2021) (citations omitted). In this case, it is undisputed that WGU knew of Meyers's disability, its consequential limitations, and the reasonable accommodation Meyers needed for such limitations. *See supra* and Exs. A and B. In addition, Meyers was and always has remained an ADA-defined "qualified individual" because he could perform the essential functions of his job with a reasonable accommodation. *See supra.*

    31.    The ADA and its supporting regulations specifically provide that making modifications to standard workplace policies fall within the definition of "reasonable accommodation." *See* 42 U.S.C. § 12111(9)(B) (specifying that the term "reasonable accommodation" may include "adjustment or modifications of . . . policies . . . ."); 29 CFR § 1630.2(o)(2)(ii) (stating that the term "reasonable accommodation" means "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position."). This makes a lot of sense: if an employer could lawfully reject or rescind a reasonable accommodation on the basis that it did not

have a policy that specifically provided for that type of accommodation, then employers could deliberately have no policies that provide for any form of accommodations and render the ADA a toothless tiger. The ADA and its supporting regulations make crystal clear that is not the law. *See supra.* Indeed, the U.S. Supreme Court has also made the same point. *See US Airways, Inc. v. Barnett*, 535 U.S., 122 S. Ct. 1516, 1521 (2002) ("preferences will sometimes prove necessary to achieve the Act's basic equal opportunity goal. The Act requires preferences in the form of "reasonable accommodations" that are needed for those with disabilities to obtain the *same* workplace opportunities that those without disabilities automatically enjoy. By definition any special "accommodation" requires the employer to treat an employee with a disability differently, *i.e.*, preferentially. And the fact that the difference in treatment violates an employer's disability-neutral rule cannot by itself place the accommodation beyond the Act's potential reach.").

32.    While most jobs require regular on-site attendance as an essential function, *see Credeur v. Louisiana*, 860 F.3d 785, 793 (5th Cir. 2017), not all do. Indeed, where – as here – a job's essential function can be performed working from home, then both courts and the EEOC have taken the position that allowing the employee to work fully or partly from home may be an ADA-required reasonable accommodation. *See Merrill v. McCarthy*, 184 F. Supp. 3d 221, 239 (E.D.N.C. 2016) (denying employer's motion for summary judgment in an ADA case and stating that "[t]elework is certainly contemplated as a viable accommodation in certain circumstances.") (citing Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, EEOC Notice No. 915.002, 2002 WL 31994335, at *24 (Oct. 17, 2002); Work at Home/Telework as a Reasonable Accommodation, https://www.eeoc.gov/facts/telework.html)); *see also Greene v. Bd. of Regents of the Univ. of*

-11-

*Georgia*, 742 F. Supp.3d 1271, 1277, 1283- (N.D. Ga. 2024) (noting that although most jobs may require in-person attendance as an essential requirement, not all jobs do, and the plaintiff submitted enough evidence that his specific job did not require in-person attendance to survive summary judgment as to his ADA claim that his employer should have reasonably accommodated him by allowing him to work from home, especially given the evidence that he had successfully worked from home for four years); *Bridgewater v. Michigan Gaming Control Bd.*, 282 F. Supp.3d 985, 997-99 (E.D. Mich. 2017) (noting that although most jobs may require in-person attendance as an essential requirement, not all jobs do, and the plaintiff submitted enough evidence that his specific job did not require in-person attendance to survive summary judgment as to his ADA claim that his employer should have reasonably accommodated him by allowing him to work at least partly from home); *Boltz v. United Process Controls*, 1:16-CV-703, 2017 WL 2153921, at *8-10 (S.D. Ohio 2017) (denying summary judgment in an ADA case on same grounds where plaintiff had sought a work at home accommodation); *Fischer v. Pepper Hamilton LLP*, No. 15–02413, 2016 WL 362507, at *10–12 (E.D. Pa. Jan. 29, 2016) (same).

33.    Meyers's case is even stronger than any of the plaintiff's cases in *Merrill, Greene, Bridgewater, Boltz,* and *Fischer* because Meyers effectively performed the essential functions of his job working from home, and without imposing any undue or other hardship in WGU, during the entire 9+ years he was employed by WGU – further demonstrating and conclusively confirming that working physically in the office in Salt Lake City was not an essential function of his job.

34.    Meyers's case is also clearly distinguishable from the Fifth Circuit's decision in *Credeur*. In *Credeur*, the plaintiff, a litigation attorney for the State of Louisiana's DOJ who was hired to work physically in the office was later allowed to work at home for approximately six

months, and during that time the record showed that "her continuous absence created a strain on the office," and "[e]ven Credeur concede[d] that her work was getting behind." *Credeur*, 860 F.3d at 795. As a result, "several of her cases had to be reassigned to other attorneys. In addition, Credeur was neglecting certain administrative tasks and failing to adequately account for her time, and issue with potentially significant repercussions for the DOJ as a public entity with fiscal accountability." *Id.* As such, when Credeur asked to be allowed to work from home full time, the DOJ rejected her request. *Id.* at 791. Given that the evidence showed that Credeur could not, and did not, perform the essential functions of her job as a litigation attorney from home the Fifth Circuit found on summary judgment that the DOJ was not obligated to grant Credeur's work at home request. *Id.* at 795.

35.    Meyers's cases is a far cry from *Credeur*. First, unlike the plaintiff in *Credeur*, Meyers was hired from the start in a remote, work from home position. Second, unlike in *Credeur*, in Meyers's case, the evidence shows for the more than nine-year period he worked remotely – including his more than two years in the role of Director of Psychometrics – there were no problems and he was able to perform all the essential functions of his job. That is not just Meyers's unilateral declaration – rather, it is the undisputed evidence, conclusively confirmed by his informally positive performance reviews and multiple promotions. In fact, when WGU told Meyers he could no longer work from home but had to move to Salt Lake City to work in its office, it did not claim that its basis for doing so had anything to do with his job performance – yet another key difference from the *Credeur* case. *See supra.*

36.    Meyers's case is also clearly distinguishable from *Jones v. City of Dallas.*, No. 3:22-cv-1477-L, 2024 WL 3207030, at *12-14 (N.D. Tex. June 6, 2024), *report and recommendation adopted*, 2024 WL 3718064 (N.D. Tex. Aug. 7, 2024). In *Jones*, the plaintiff

-13-

always worked from the office and the employer had never allowed any remote work. *Id.* at *12. While the employer had permitted remote work after the plaintiff had been terminated, that did not support her case because: (a) that occurred after the plaintiff had already been terminated; and (b) more significantly, the employer only allowed remote work for a short time specifically in response to executive orders issued by the Dallas County Judge recognizing COVID-19 as a public health emergency and recommending minimizing exposure in the workplace through telecommuting. *Id.* at *13. *Jones* is thus factually inapposite to Meyers's case. If anything, it supports Meyers's case, because, unlike the employer in *Jones*, WGU had *always* permitted working from home both before and after COVID, and indeed throughout Meyers's entire career with WGU. *See supra.* Finally, in *Jones*, the employer offered a robust, evidence-based justification for its position that working in the office was an essential function of Jones's job. Id. at *12-13. Here, in contrast, WGU offered no such evidence, instead only vaguely asserting – tellingly after a month-long delay – that "WGU's evolving business needs and Future of Work initiative, it has been determined that effectively performing the essential functions of your role as Director, Psychometrics requires co-location in WGU's Salt Lake City office. Therefore, we are unable to grant this accommodation." *See* Ex. B at page 1 of 5.

37.    Finally, *Turner v. Bd. of Supervisors of the Univ. of La. Sys.*, 644 F. Supp. 3d 221 (E.D. La. 2022) is not on point. In that case, Turner was hired to be an in-person teacher at Nicholls State University. She later asked to teach exclusively online as an accommodation for her irritable bowel syndrome. The university rejected her request. Turner sued and the court granted summary judgment for the university. The court found that Turner's request was not reasonable because it would have required the university to reassign adjunct professors from their assigned in-class teaching positions to cover her in-person classes. *Id.* at 224, 231. WGU has not alleged that it

-14-

could not accommodate Meyers because a reassignment of other employees would be required. Rather, as noted above, WGU's only articulated rationale for not granting Meyers's his requested work at home accommodation was its vague assertion – after a month-long delay – that "WGU's evolving business needs and Future of Work initiative, it has been determined that effectively performing the essential functions of your role as Director, Psychometrics requires co-location in WGU's Salt Lake City office. Therefore, we are unable to grant this accommodation." *See* Ex. B at page 1 of 5. In short, the cases of *Credeur, Jones,* and *Turner* are not on point. Rather, Meyers's case is far more consistent with the plaintiff's cases in *Merrill*, *Greene, Bridgewater*, *Boltz*, and *Fischer*.

C.     **Third Element of His *Prima Facie* Case: Meyers Was Subject To An Adverse Employment Decision On Account Of His Disability**

38.     There is no question that Meyers suffered an adverse employment decision when he was terminated. *See LHC Grp., Inc.*, 773 F.3d at 700 (termination is an adverse action under the ADA). There is also no doubt that WGU terminated Meyers because of the workplace limitations caused by his disability (which could have been reasonably accommodated). *See infra.*

D.     **WGU Offers No Legitimate, Non-discriminatory Reason For Effectively Terminating Meyers; To The Contrary, There Is No Dispute That Meyers Was Effectively Terminated Because Of His Disability**

39.     WGU did not offer a rationale for Meyers's termination that was unconnected to his disability – for example, poor job performance, insubordination, workplace policy violation, fighting on the job, etc. To the contrary, it is undisputed that WGU terminated Meyers simply because it refused to grant his request for a reasonable accommodation for no lawful reason, thus providing "direct evidence" of WGU's discriminatory intent. *See, e.g., Rizzo v. Children's World Learning Ctrs., Inc.*, 84 F.3d 758, 762 (5th Cir. 1996) ("In the instant case there is direct evidence that Children's World made an employment decision because of a disability. Children's World

does not deny that Rizzo was removed from driving duties because of her hearing impairment. Therefore, we need not engage in the *McDonnell Douglas* presumptions in order to infer discrimination: Children's World admits that it discriminated."); *Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 588, 594 (5th Cir. 2016) (noting that pretext was not an issue when the entire ADA case simply turned on whether the plaintiff was qualified for the job, because there was no claim by the employer that the plaintiff was terminated for some reason entirely distinct from their disability); *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 298 (6th Cir. 2019) (because "not making reasonable accommodations" is listed in the ADA's definition of disability discrimination, *see* 42 U.S.C. § 12112(b)(5)(A), "claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination.") (citation omitted). In short, Meyers makes out all the elements of an ADA case and establishes WGU's liability for violating the ADA. *See supra.*

## V.  **JURY DEMAND**

40.    Meyers demands a jury trial.

## VI.    **CONDITIONS PRECEDENT**

41.    Meyers has satisfied all conditions precedent necessary to file this suit and has exhausted all required pre-suit administrative remedies. *See supra.*    He has also filed this suit timely.

## VII.  **DAMAGES**

42.    Meyers has suffered lost back-pay and front-pay, including lost benefit contributions and other benefits, as well as related economic damages.

43.    Meyers has suffered compensatory damages, including "emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary

losses." 42 U.S.C. § 1981a(b)(3). *See, e.g., Giles v. General Electric Co.*, 245 F.3d 474, 489 (5th Cir. 2001) (awarding $150,000 in compensatory damages in ADA case).

44.     WGU acted with malice or reckless disregard of Meyers's rights under the ADA, thus justifying the imposition of punitive damages. 42 U.S.C. § 1981a(b)(1). *See, e.g., E.E.O.C. v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724, 733-34 (5th Cir. 2007) (upholding $300,000 punitive damages award in an ADA case).

## VIII. PRAYER

Meyers asks that the Court issue citation for Defendant WGU to appear and answer, and that Meyers be awarded a judgment against Defendant WGU for the following:

a.     Actual damages including but not limited to pecuniary losses, non-pecuniary losses, back-pay, reinstatement (or front-pay), and compensatory damages under the ADA;

b.     Punitive damages under the ADA.

c.     Prejudgment and post-judgment interest;

d.     Court costs;

e.     Attorneys' fees; and

f.     All other relief to which Plaintiff is entitled.

Respectfully submitted,

OBERTI SULLIVAN LLP

By:   s/ Mark J. Oberti
       Mark J. Oberti
       State Bar No. 00789951
       S.D. Texas No. 17918
       712 Main Street, Suite 900
       Houston, Texas 77002
       (713) 401-3555 – Telephone
       (713) 401-3547 – Facsimile
       mark@osattorneys.com – Email

       ATTORNEY-IN-CHARGE FOR PLAINTIFF
       JASON MEYERS

OF COUNSEL:

Edwin Sullivan
State Bar No. 24003024
S.D. Texas No. 24524
712 Main Street, Suite 900
Houston, Texas 77002
(713) 401-3555 – Telephone
(713) 401-3547 – Facsimile
ed@osattorneys.com – Email

ATTORNEY FOR PLAINTIFF
JASON MEYERS

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JASON MEYERS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. _____ |
| | § | |
| WESTERN GOVERNORS UNIVERSITY | § | |
| | § | |
| Defendant. | § | |
| | § | |

## AFFIDAVIT OF JASON MEYERS

STATE OF ~~TEXAS~~ FLORIDA §
§
COUNTY OF ~~AUSTIN~~ DOVAL §

On this day, Jason Meyers appeared before me, the undersigned authority, who upon his

oath, deposes and states:

1.  I am over the age of 21, competent to make this affidavit, and have personal knowledge that everything stated herein is true and correct.

2.  I have read Plaintiff's Sworn Original Complaint in this case. Unless otherwise indicated as being on "information and belief," the statements under the heading "Factual Background" in Plaintiff's Sworn Original Complaint in this case are all true and correct on my personal knowledge. Further, the documents attached to Plaintiff's Sworn Original Complaint as Exhibits A and B are true and correct copies of their originals.

3.  Further, Affiant sayeth naught.

*Jason Leon Meyers*

_____
JASON MEYERS

-19-

State of Florida, County of Duval

SUBSCRIBED AND SWORN TO before me on this the 10th day of August 2025, certify which witness my hand and seal of office. By Jason Leon Meyers



HASNAIN SIRAJ
Notary Public - State of Florida
Commission # HH 492757
Expires on June 10, 2028

Notary Public in and for
The State of T~~EXXAS~~   Florida  H S
Printed name: ___Hasnain Siraj___
Notary ID: ____HH 492757____

Notarized remotely online using communication technology via Proof.

Type of Identification Produced: DRIVER LICENSE

# EXHIBIT A



**WGU**
THE UNIVERSITY OF YOU

---

**LIMITED RELEASE OF MEDICAL INFORMATION**

My signature below indicates my limited release of medical information to my employer
Western Governors University as requested in this letter and as is necessary to assess
the availability of reasonable accommodation to me at work

_____    8/6/2024
Signature                                                        Date

JASON  L  MEYERS
Employee's Printed Name

---

## ADA Medical Inquiry Form

Date: _____

Dear Healthcare Provider:

_____ is an employee of our organization and has requested a
reasonable accommodation under the Americans with Disabilities Act. In response to this request,
we are seeking specific information as detailed on the following three pages. Please respond fully
and completely to the questions on the following pages. Do not provide information that is not related
to the employee's ability to perform essential job functions. Attach additional information if necessary
In completing this form, you must provide your best medical judgment, based on current information

Please return the completed form (3 pages) to:

Email: benefits@wgu.edu
Fax: (801) 880 - 0420
Mail: Attn - P&T Leave & Disability
4001 South 700 East STE 700
Salt Lake City, UT 84107

Thank you for your cooperation.



EXHIBIT
A

*Jason Meyers*

**IMPORTANT NOTICE ABOUT GINA**

The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. Genetic information as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services

1  Does the employee have a physical or mental impairment? Please evaluate the employee as if the medical condition was in an active state and without the benefits of medication or other mitigating measures, except ordinary eyeglasses or contact lenses.

   ☒ Yes
   ☐ No

2. If yes, please list the impairment

   _Depression, Anxiety, panic disorders_

3  Does the impairment affect a major life activity?

   ☒ Yes
   ☐ No

4. If yes, check any major life activity or major bodily function that is affected:

   Major life activity:

   ☐ Bending           ☐ Hearing                ☐ Reaching        ☒ Speaking       ☐ Other:
   ☐ Breathing         ☒ Interacting With       ☒ Reading         ☐ Standing          (describe)
   ☐ Caring For Self      Others                ☐ Seeing          ☒ Thinking
   ☐ Concentrating     ☐ Learning               ☐ Sitting         ☐ Walking
   ☐ Eating            ☐ Lifting                ☐ Sleeping        ☒ Working
                       ☒ Performing Manual                        *increased Anxiety*
                          Tasks

   Major bodily functions:

   ☐ Bladder           ☐ Digestive              ☐ Lymphatic           ☐ Reproductive
   ☐ Bowel             ☐ Endocrine              ☐ Musculoskeletal     ☐ Respiratory
   ☐ Brain             ☐ Genitourinary          ☐ Neurological        ☐ Special Sense Organs &
   ☐ Cardiovascular    ☐ Hemic                  ☐ Normal Cell Growth     Skin
   ☐ Circulatory       ☐ Immune                 ☐ Operation of an Organ  ☐ Other: (describe)

   *N/A*

5   If yes, is the employee's ability to perform the major life activity or major bodily function substantially limited by the impairment compared to an average person in the general population? Substantial limitation means that the employee is restricted as to the condition manner, or duration under which [she/he] performs the activity

☒ Yes
☐ No

6   Please indicate how long you anticipate this impairment will substantially limit the major life activity or major bodily function

Permanently

7   Does the employee's impairment substantially limit the ability to perform the essential job functions identified in the attached job description?

☒ Yes
☐ No

8.  If yes, what essential job function(s) are substantially limited?

all job functions
Anxiety impairs his ability to work at the office

9.  How does the impairment substantially limit the employee's ability to perform the essential job function(s)?

Anxiety impairs his ability to work at the office

10. Can you identify a reasonable accommodation that may enable the employee to perform the essential job function(s)? (Examples of potential accommodation include restructuring a job, modification of work tools or equipment, a modified work schedule, or provision of qualified readers or interpreters )

☒ Yes
☐ No

work from home permanently 8am-5pm
m-friday

11  If yes, please provide specific examples of accommodations that may enable the employee to perform the essential job function(s), or that may overcome an identified barrier in the workplace associated with the impairment

work from home permanently 8-5pm
monday-friday

12. How will the accommodation assist the employee to perform the essential job function(s)?

His anxiety is well managed when he is home

13. How long do you anticipate the employee will need the accommodation?

permanently

14. If the accommodation is a leave of absence, will a leave of absence assist the employee to return to work?

☐ Yes

☒ No

15. How will a leave of absence assist the employee in returning to work?

16. What dates do you anticipate the employee will need leave? [Note: You must provide your best medical judgment, based on current information, as to the length of leave.]

17. If a leave of absence is granted, what is the likelihood that the employee will be able to return at the end of the leave?

Thank you for your professional attention to this matter. Please assist us further by signing below to indicate that you have personally evaluated the employee and reviewed the attached medical information and job description.

_Wendy Lee_ _____    _8/7/24_ _____

Health Care Provider Signature               Date

_Wendy Lowrx   MSN, APRN, PMHNP-BC_ _____

Print Name and Title

# EXHIBIT B

 Outlook

### Re: Accommodation Discussion for Jason Meyers

| | |
|---|---|
| Organizer | Ashley Gonzalez <ashley.gonzalez@wgu.edu> |
| Meeting time | This event occurred 5 months ago (Wed 10/30/2024 11:00 AM - 11:30 AM) |
| Location | Microsoft Teams Meeting |
| My response | Accepted |
| Required attendees | Ashley Gonzalez, Randi Billingsley-White (She, Her), Jason Meyers |
| Message sent | Mon 12/2/2024 4:18 PM |

Hi Jason,

Thank you again for taking the time to connect with Randi and me to discuss your accommodation request. We have reviewed your request to continue to permanently work remotely. In light of WGU's evolving business needs and Future of Work initiative, it has been determined that effectively performing the essential functions of your role as Director, Psychometrics requires co-location in WGU's Salt Lake City office. Therefore, we are unable to grant this accommodation.

This decision reflects WGU's enhanced leadership expectations, which emphasize in-person collaboration to achieve WGU's evolving strategic and operational goals.

That said, the current expectation for co-located roles to transition back to a regular in-office presence is based on a rolling timeline specific to each team. Your role will not be co-located in the SLC office until August 2025.

WGU remains committed to engaging in the interactive process and supporting you during this transition. We are happy to address accommodations you may need within the SLC office or during the relocation process to ensure you have what is necessary to help you succeed in your role.

Please let me know if you have any questions or concerns.

**Ashley Gonzalez**
P&T Leave and Disability Case Specialist

**Questions?**
*Contact the P&T Leave & Disability Team*
*by visiting the WGU People Center*
**Western Governors University**
Fax: 801.880.0420
benefits@wgu.edu



This message may contain information that is confidential and priv_____ recipient (or authorized to receive this



EXHIBIT
B

*message for the intended recipient), you may not use, copy, disseminate or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail, and delete the message.  Thank you*

**From:** Ashley Gonzalez <ashley.gonzalez@wgu.edu>
**Sent:** Thursday, November 21, 2024 11:48 AM
**To:** Jason Meyers <jason.meyers@wgu.edu>; Randi Billingsley-White (She, Her) <r.billingsleywhite@wgu.edu>
**Subject:** Re: Accommodation Discussion for Jason Meyers

Hi Jason,

So sorry for my delay, I have been OOO and returned today.

The communication created is currently still being reviewed by leadership. I have nudged them today to get a better idea of when we should be expecting to send that out to you. Once I have an update I will communicate with you. Please let me know if you have any questions.

Thank you,


**Ashley Gonzalez (She/Her)**
**Senior Benefits Analyst**
**P&T Leave & Disability Specialist**

**Western Governors University**
ashley.gonzalez@wgu.edu
**O: 385-428-4519 | F: 801-880-0420**

**WGU** 🦉

wgu.edu

*This message may contain information that is confidential and privileged. Unless you are the intended recipient (or authorized to receive this message for the intended recipient), you may not use, copy, disseminate, or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail, and delete the message.  Thank you.*


**From:** Jason Meyers <jason.meyers@wgu.edu>
**Sent:** Wednesday, November 13, 2024 12:55 PM
**To:** Ashley Gonzalez <ashley.gonzalez@wgu.edu>; Randi Billingsley-White (She, Her) <r.billingsleywhite@wgu.edu>
**Subject:** Re: Accommodation Discussion for Jason Meyers

Good afternoon. May I please have an update on this?

Thank you
Jason

**Jason L. Meyers, Ph.D.**
Director of Psychometrics
<u>Western Governors University</u>
p: (385) 428-5122

From: Ashley Gonzalez <ashley.gonzalez@wgu.edu>
Sent: Monday, November 4, 2024 4:17 PM
To: Jason Meyers <jason.meyers@wgu.edu>; Randi Billingsley-White (She, Her) <r.billingsleywhite@wgu.edu>
Subject: Re: Accommodation Discussion for Jason Meyers

Hi Jason,

Thank you for reaching out. I wanted to give you an update that we are working on getting this communication in writing to you. Once the communication is finished I will send it your way. Please let me know if have any questions.

Thank you,

**Ashley Gonzalez (She/Her)**
**Senior Benefits Analyst**
**P&T Leave & Disability Specialist**

**Western Governors University**
ashley.gonzalez@wgu.edu
O: 385-428-4519 | F: 801-880-0420



wgu.edu

*This message may contain information that is confidential and privileged. Unless you are the intended recipient (or authorized to receive this message for the intended recipient), you may not use, copy, disseminate, or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail, and delete the message.  Thank you.*

From: Jason Meyers <jason.meyers@wgu.edu>
Sent: Thursday, October 31, 2024 7:09 AM

4/4/25, 4 54 PM

Mail - Jason Meyers - Outlook

To: Ashley Gonzalez <ashley.gonzalez@wgu.edu>; Randi Billingsley-White (She, Her)
<r.billingsleywhite@wgu.edu>
Subject: Re: Accommodation Discussion for Jason Meyers

As discussed, please send me documentation on this decision and rationale.

Thank you

**Jason L. Meyers, Ph.D.**
Director of Psychometrics
Western Governors University
p: (385) 428-5122

From: Ashley Gonzalez
Sent: Monday, October 28, 2024 12:59 PM
To: Ashley Gonzalez <ashley.gonzalez@wgu.edu>; Randi Billingsley-White (She, Her)
<r.billingsleywhite@wgu.edu>; Jason Meyers <jason.meyers@wgu.edu>
Subject: Accommodation Discussion for Jason Meyers
When: Wednesday, October 30, 2024 11:00 AM-11:30 AM.
Where: Microsoft Teams Meeting

Hi Jason,

I hope you are doing well. First, I want to extend my gratitude and appreciation for your patience during
this process. It does not go unnoticed!

Your P&T Business Partner (Randi Billingsley-White) and I would like to discuss your accommodation
request and the next steps in the process. Please let me know if you have any questions or how I can
assist you.

Thank you,
Ashley

---

**Microsoft Teams** Need help?

## Join the meeting now

Meeting ID: 276 079 228 310
Passcode: xXyZgF

Dial in by phone

Mail - Jason Meyers - Outlook

+1 385-419-4176,,326039067# United States, Salt Lake City

Find a local number

Phone conference ID: 326 039 067#

**Join on a video conferencing device**

Tenant key: wguvideo@m.webex.com

Video ID: 118 225 629 8

More info

For organizers: Meeting options | Reset dial-in PIN